## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-65 (LLA)** |
| **v.** | : | |
| | : | |
| **ADAM KOVSKY,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Adam Kovsky to 30 days of incarceration, 12 months of supervised release, 60 hours of community service, $500 in restitution, and a $25 mandatory special assessment.

### I.     Introduction

Defendant Adam Kovsky, a 32-year-old managing director of a community farm and event space, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Kovsky pled guilty to violating 18 U.S.C. § 1752(a)(1), Entering or Remaining in a Restricted Building or Grounds, for his conduct on January 6, 2021. The government's recommendation is well supported by Kovsky's blatant disregard for the clear indications that he was not permitted on Capitol grounds on January 6 and his disrespect for the building and its symbolism by removing a piece of broken furniture from the Building, but takes account of Kovsky's willingness to submit to a voluntary, pre-charging interview with the FBI and his early willingness to plead guilty and accept responsibility for his conduct.

The Court must also consider that Kovsky's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Kovsky's crime support a sentence of 30 days of incarceration and 12 months of supervised release, to include 60 hours of community service in this case.

## II.      Factual and Procedural Background

### A.      The January 6, 2021, Attack on the Capitol

On January 6, 2021, thousands of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Kovsky's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020, Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. (*See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 13-19.)

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to

engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds

streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.





*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### Injuries and Property Damage Caused by the January 6, 2021, Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at

14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at*   https://www.hsgac.senate.gov/imo/media/doc/ HSGAC&RulesFullReport_ExaminingU.S.CapitolAttack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021 attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol

Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the Capitol, resulting in losses of more than 2.7 million dollars.

### *Defendant Kovsky's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Kovsky attended former President Trump's "Stop the Steal" rally with two female companions with whom he had travelled to Washington, D.C. from their home in Michigan. After attending the rally, the trio walked with other rioters through the National Mall towards the West Front of the Capitol. Eventually, Kovsky and his travel companions joined the amassing crowd on the west plaza of the Capitol. To reach the west plaza, Kovsky passed through several layers of barricades and posted signs indicating that the Capitol grounds were closed. In addition, police were assembled on the west plaza to deter the attack on the Capitol, but those officers were quickly overwhelmed. During his interview with his Probation Officer, Kovsky admitted that he knew that he was not supposed to be on Capitol grounds: "From the moment I got to the lawn, it was obvious that I should not have been there. There were barricades and police with tear gas." PSR ¶ 31. Yet despite this knowledge, Kovsky chanted and clapped on the west plaza with the hordes of rioters. *See* Image 1.



*Image 1: Still from an open source video showing Kovsky (circled in white) chanting and clapping with the crowd on the west front of the Capitol*

Kovsky later ascended a staircase to the Upper West Terrace of the Capitol building. As he did so, Kovsky assisted one of his companions in scaling the banister of the staircase. *See* Image 2.



*Image 2: Open-source image showing Kovsky assisting one of his travel companions over a banister on the west side of the Capitol building (all three subjects are highlighted by a white box; the subjects' faces are circled in yellow)*

The U.S. Capitol Police ("USCP") maintains a system of closed-circuit surveillance video cameras ("CCTV") throughout the U.S. Capitol Building and in and around its perimeter. CCTV recordings from January 6, 2021 show Kovsky entering the building through a broken window next to the Senate Wing Door at approximately 3:26 p.m. *See* Image 3.



*Image 3: Screenshot of CCTV showing Kovsky (circled in white) entering the Capitol Building through a broken window next to the Senate Wing Door*

Unable to proceed much farther into the building, Kovsky exited through the Senate Wing Door, as guided by U.S. Capitol Police, approximately four minutes later at 3:30 p.m. *See* Image 4. After exiting the building, the three subjects remained on the Upper West Terrace of the Capitol and joined the amassed crowd in chanting "Our house, our house!" *See* Image 5.



*Image 4: Screenshot of CCTV showing Kovsky (circled in white) exiting the Capitol Building through the Senate Wing Door*



*Image 5: Kovsky (highlighted in the white box) on the Upper West Terrace while the crowd chants "Our house, our house!"*

A social media post from after January 6 shows Kovsky posing outside of the Capitol Building with a piece of broken furniture that he picked up while inside the building. *See* Image 6.



*Image 6: Social media post depicting KOVSKY posing with pieces of wood from broken furniture from inside the U.S. Capitol Building*

### Kovsky's June 2022 Voluntary Interview with the FBI

In June 2022, the FBI interviewed Kovsky with his lawyer present. Kovsky reported that he planned to travel to Washington, D.C. to see former President Trump's speech. He travelled to the Capitol with three other individuals by car on January 5, 2021. Kovsky acknowledged that they attended the former President's speech at the Ellipse and then walked to the Capitol building. Kovsky identified himself and his travel companions in photographs from January 6, including in CCTV images like those above showing the three subjects entering the Capitol Building. During his interview, Kovsky acknowledged noticing rioters with vests, helmets, backpacks, and other military style gear and clothing on January 6. Kovsky initially withheld the fact that he had retained

the broken pieces of wooden furniture that he took from the Capitol. *See* Image 6, above. Later the same day, after FBI agents had left Kovsky's lawyer's office, but returned at the attorney's request, Kovsky disclosed that he still had the pieces of wood, which he eventually provided to FBI.

### The Charges and Plea Agreement

On December 12, 2023, Kovsky was charged in a complaint with Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); Disorderly Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2): Disorderly Conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). On December 21, 2023, Kovsky self-surrendered to FBI and was subsequently released on conditions. On February 6, 2024, the United States charged Kovsky in a one-count Information with entering or remaining in a restricted building or grounds in violation of 18 U.S.C. 1752(a)(1). On March 11, 2024, pursuant to a plea agreement, Kovsky pled guilty before this Court to the Information. By his plea agreement, Kovsky agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Kovsky now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Kovsky faces up to six months of imprisonment and a fine of up to $5,000. Kovsky must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

17

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

The government agrees with the Sentencing Guidelines calculation set forth in the PSR, which mirror the parties' calculation of the Guidelines in the plea agreement. In the plea agreement, Kovsky reserved his right to seek the so-called "Zero Point Offender" adjustment under U.S.S.G. § 4C1.1. *See* Doc. 21, at 4. At this juncture, the government agrees with the Probation Officer that § 4C1.1 applies in this case.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Chapter Four Adjustment | - 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 2 |

*See* PSR at ¶¶ 33-41.

While the Government concedes that § 4C1.1 applies to Kovsky, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters

18

collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus Kovsky's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

The U.S. Probation Office calculated Kovsky's criminal history as a category I. PSR ¶ 44. Accordingly, the U.S. Probation Office calculated Kovsky's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0-6 months of imprisonment. PSR ¶¶ 86. Kovsky's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the

Section 3553(a) factors weigh in favor of 30 days of incarceration and 12 months of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Kovsky's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Kovsky, the absence of violent or destructive acts is not a mitigating factor. Had Kovsky engaged in such conduct, he would have faced additional criminal charges.

Here, Kovsky entered the Capitol Building despite obvious signs that he should not, and he joined in chants and cheers by other rioters outside the building, despite recognizing the wrongfulness of his actions. Moreover, in the four minutes that Kovsky was inside the building, he managed to pick up a broken piece of wooden furniture, which he brough home as a souvenir. This comports with his initial celebratory attitude towards the rioters' "success" in overtaking the building. Accordingly, the nature and the circumstances of this offense establish the need for short period of incarceration followed by supervised release in this matter.

### B.  Kovsky's History and Characteristics

As set forth in the PSR, Kovsky has no criminal history. *See* PSR ¶¶ 42-44. He is married and is the father of two young children. PSR ¶ 54. Kovsky does not report any abuse of alcohol or drugs, PSR ¶¶ 63-65, and he reported a supportive upbringing, PSR ¶¶ 49-53. He has been

employed since 2018 at a community farm and event center, and he holds a bachelor's degree. PSR ¶¶ 66, 72.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a short term of imprisonment. As outlined above, Kovsky has experienced many advantages in his life – he has a supportive home life, a strong educational background, and consistent employment history. And yet, despite these advantages and in spite of recognizing the wrongfulness of his participation in the January 6 riot, he still entered the restricted area and celebrated doing so. The Court must sentence Kovsky in a manner to deter him from ignoring his better judgment in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Kovsky based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Kovsky has pleaded guilty to Count One of the Information, charging him with Entering or Remaining in a Restricted Building or Ground, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. Section 3553(a)(6) of Title 18 directs a

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although the other defendant discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Michael McCormick*, 21-cr-710 (TSC), the defendant pled guilty to only a petty offense, a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building, rather than a Class A misdemeanor, as Kovsky did. Like Kovsky, McCormick approached the Capitol building despite observing armored police guarding the building and tear gas choking the air. Similarly to Kovsky, McCormick spent only a short time inside the Capitol during the riot, approximately 8 minutes. McCormick's January 6 conduct was worse than Kovsky's insofar as McCormick took a video recording his trespass through the Capitol

then deleted pictures and videos from his phone after the FBI contacted him. And unlike Kovsky, McCormick did not express remorse for his January 6 conduct before the sentencing hearing. *See* 21-cr-710 (TSC), Dkt. No. 33 (Gov't. sentencing memorandum). Judge Chutkan sentenced McCormick to 14 days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Kovsky must pay $500 in restitution, which reflects in part the

role Kovsky played in the riot on January 6.[4] Plea Agreement at 8. As the plea agreement reflects,

the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a

figure based on loss estimates supplied by the Architect of the Capitol and other governmental

agencies as of July 2023." *Id.* Kovsky's restitution payment must be made to the Clerk of the

Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See*

PSR ¶ 109.

## VII.   Fine

Kovsky's conviction for violating 18 U.S.C. § 1752(a)(1) subjects him to a statutory

maximum fine of up to $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a

fine, the sentencing court should consider Kovsky's income, earning capacity, and financial

resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide

---

against property … including any offense committed by fraud or deceit," "in which an identifiable
victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not
qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can
be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9
(D.D.C. 2012) (citations omitted).

for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Kovsky to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Kovsky has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $200 to $9,500. U.S.S.G. § 5E1.2(c).

**VIII.   Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Kovsky to 30 days of incarceration, 12 months of supervised release, to include 60 hours of community service, $500 in restitution, and a $25 mandatory special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Kovsky's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Katherine E. Boyles*
Assistant United States Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D St. NW
Washington, DC 20001
Email: Katherine.Boyles@usdoj.gov